# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:19-CIV-24656-KING/BECERRA

ARMOR CORRECTIONAL HEALTH
SERVICES, INC.

      Plaintiff,

v.

BRUCE TEAL

      Defendant.

_____

### [PROPOSED] SECOND AMENDED VERIFIED COMPLAINT
### FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff, Armor Correctional Health Services, Inc. ("Armor"), hereby amends its First Amended Complaint against Defendant, Bruce Teal, ("Teal"), and states:

### NATURE OF THE ACTION

1.      This action seeks damages and injunctive relief to address Teal's (i) improper interference with and diversion of Armor's client[s] in knowing violation of Teal's employment and post-employment obligations and Florida law.; (ii) misappropriation of trade secrets in violation of Florida's Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. 688.01 *et seq.*; and (iii) improper access of Armor's secured computer systems. Despite holding a position of importance with Armor, which entitled him to access Armor's business strategies and proprietary trade secrets, Teal used Armor's confidential information to further his own interests and the interests of his new employer. Specifically, Teal covertly worked to cause at least one Armor client to move its business to Corizon Health, Inc., ("Corizon"), Teal's new employer and a direct competitor of Armor. To steal Armor's business, Teal absconded with trade secrets and other confidential and

proprietary data to provide himself and Corizon with an illegal, competitive advantage. Additionally, Teal engaged in a concerted effort to disparage and damage Armor's reputation in an effort to steal Armor's customers and interfere with Armor's business and contractual relationships. As a result, Armor seeks to protect its confidential business information and to curtail this unfair competition.

## THE PARTIES, JURISDICTION AND VENUE

2.       Armor is a Florida corporation and has its principal place of business in Miami, Florida.

3.       Armor is a healthcare provider with a substantial presence in the Southeast United States, including Florida. Armor focuses on providing medical services to correctional facilities.

4.       Teal is a Tennessee resident domiciled in Hendersonville. Teal is a former employee of Armor.

5.       Armor brings this action for damages in excess of $15,000.00, exclusive of interest, costs, and attorneys' fees, and for injunctive relief seeking to protect its goodwill, clients and proprietary information, among other things.

6.       This Court properly has subject matter jurisdiction and personal jurisdiction, including both specific and general jurisdiction over the Defendant, pursuant to Florida Statute Section 48.193(1)(a), (b) and 48.193(2) and 28 U.S.C. §1332.

7.       Venue is proper in Miami-Dade County, Florida pursuant to Fla. Stat. §§ 47.011 and 47.021.

## GENERAL ALLEGATIONS

8.       Armor is a preeminent provider of medical services to correctional facilities, offering comprehensive medical, dental, and mental health services to patients in jails and prisons.

Armor currently provides healthcare services to over 20,000 inmates across the United States. One of the keys to Armor's business is to partner directly with municipal-government entities and then offer its healthcare services to those municipalities' local correctional facilities.

9.      Corizon is a major competitor of Armor, and similarly offers medical services to inmates in correctional facilities. Like Armor, Corizon targets local governments as clients and works with them to provide healthcare services directly to their jails and prisons.

10.     Teal worked for Armor for over ten years, eventually being promoted to Chief Executive Officer, before he recently left to join Corizon. In his previous fiduciary position with Armor, Teal was charged with maintaining the daily operations of Armor and formulating long-term strategy. Among his many duties, Teal took the lead on or was significantly involved with important business development efforts. Specifically, Teal worked on bid proposals and negotiations to secure new clients. One such client that Teal helped recruit for Armor is Brevard County Sheriff's Office ("Brevard"). In addition to his responsibilities with business development, Teal had significant contact with existing clients, including Brevard.

11.     To perform his job, Armor provided Teal with access to a variety of trade secrets and confidential and proprietary company information, including, but not limited to: client lists, pricing information, financial information, business strategy, vendor and provider information, and employee identity and performance information ("Confidential Information").

12.     Given the trust placed in Teal, and the value he was believed to be adding to Armor, Armor involved Teal in high-level strategy decisions and rewarded Teal accordingly. For example, when a prior merger transaction appeared to have been finalized, Teal instigated Armor to pay him a bonus in the range of $1,300,000, as contemplated by his Employment Agreement, even though that transaction was ultimately unwound and fell through.

13.     To protect itself from unfair competition, including the improper use of its Confidential Information, and to preserve the value of its customer relationships, Armor requires key employees to sign an agreement prohibiting post-employment competition with Armor for a period of time following the employee's separation from Armor. Additionally, Armor has in place policies and procedures aimed at protecting its Confidential Information and trade secrets.

14.     Armor's relationships with its customers, including customer goodwill, is the backbone of its business.

### Teal's Employment Agreement with Armor

15.     In 2006, Teal signed an agreement that contained essential post-term restrictive covenants ("Employment Agreement"). The Employment Agreement is attached as **Exhibit "A."**

16.     Specifically, in the Employment Agreement, Teal acknowledged and agreed that as an executive he had "major responsibility for the growth and development of the corporation's business" and that because of his role he would be brought "into close contact with confidential information of the Corporation and its customers." *See* Ex. A at ¶ 4. Given the sensitive nature of the information he would be exposed to, Teal agreed to keep these secrets confidential, as follows:

> 4(a) <u>Confidential Information</u>. Except as may be required by the lawful order of a court or agency of competent jurisdiction, **<u>[Teal] agrees to keep secret and confidential</u>**, both during the Employment Period and during the two years after [Teal's] employment with [Armor] terminates, **<u>all non-public information concerning Armor and its affiliates that was acquired by, or disclosed to, [Teal] during the course of his employment by [Armor] or any of its affiliates, including information relating to customers (including, without limitation, credit history, repayment history, financial information and financial statements), costs, and operations, financial data and plans</u>**, whether past, current or planed and not to disclose the same, either directly or indirectly, to any other person, firm or business entity, or to use it any way . . . . **<u>Teal further agrees that he shall not make any statement</u>** or disclosure that (i) would be prohibited by applicable federal or state laws, or (ii) is **<u>intended or reasonably likely to be detrimental to [Armor] or any of its subsidiaries or affiliates</u>**.

*See* Ex. A at ¶ 4(a) (emphasis added).

4

17.     Furthermore, and as additional consideration for his employment, Teal agreed that, following the end of his employment, he would not compete with Armor for one year and that he would not engage in business with any Armor client for two years, as follows:

> 4(b) <u>Non-Competition</u>. **[Teal] agrees** that for the period commencing on the Commencement Date and ending upon expiration of (i) *one* year after the executive's employment with [Armor] terminates, [Teal] shall not directly or indirectly, alone or as a partner, officer, director, employee, consultant, agent, independent contractor, member or stockholder of any person or entity ("Person"), engage in any business activity in the State of Florida, the State of Mississippi or any other State in which [Armor] conducts its Business, which is directly or indirectly in competition with [Armor] or its affiliates, and (ii) *two* years after [Teal's] employment with Armor terminates, **[Teal] shall not** directly or indirectly, alone or as a partner, office, director, employee, consultant, agent, independent contractor, member or stockholder of any Person, **engage in any  business activity with any Person that is subject to an existing contract on the termination date of the [Teal's] employment with [Armor]** (items (i) and (ii) shall be referred as the "<u>Non-Competition Period</u>"). The "Business" of the Corporation shall mean the actual business of the Corporation during the Employment Period and as of the date [Teal] leaves the employment of [Armor]. As of the date hereof, the Business of [Armor] is managing and operating medical centers.

*See* Ex. A at ¶ 4(b) (emphasis added).

18.     The Employment Agreement only permitted amendment "by mutual agreement of the parties' in writing." *See* Ex. A at ¶10.

19.     Teal also acknowledged that his breach of the restrictive covenants discussed above would cause Armor irreparable harm and that Armor would be entitled to a temporary and permanent injunction. *See* Ex. A at ¶ 4(c)(ii).  Additionally, Teal acknowledged and agreement that he "shall account for and pay over to [Armor] all compensation, profits, and other benefits which inure to [Teal's] benefit which are derived or received by [Teal]…from any action or transactions constituting a breach of any of the Restrictive Covenants.

***Teal's Wrongful Conduct***

20.     Teal eventually represented to Armor that he would work on Armor's behalf for a possible merger with Corizon. When Teal made this representation to Armor that he would

work on a potential merger, Teal concealed his Employment Agreement from Armor's leadership, or at a minimum, exploited the fact that Armor's current leadership, which had changed several times over from the date of execution of the Employment Agreement, was not aware of the specifics of any Employment Agreement.

21.     As a result of Teal's concealment of the Employment Agreement (and his representations that he would work on Armor's behalf for a possible merger with Corizon), Teal caused Armor to believe, at that time, that Teal was not burdened by restrictions on his ability to work for an Armor competitor and Teal failed to advise or remind Armor leadership that he was not permitted to work for a competitor. Based on Teal's actions, Armor indicated in a writing to Corizon that Teal would be permitted to perform services on behalf of both Armor and Corizon in conjunction with a possible merger between the two entities ("Armor Letter"). Armor's understanding and intent in agreeing to the Armor Letter was for the limited purpose of permitting Teal to work on the possible merger and did not permit Teal to use Armor's Confidential Information or to violate his post-employment restriction against stealing Armor clients.

22.     Rather than make any good faith effort to effectuate the merger, Teal instead used the opportunity to induce the Armor Letter and thereby steal Armor's Confidential information for the benefit of himself and of Corizon as a direct competitor.

23.     Effective November 10, 2018, Teal terminated his employment with Armor. Shortly thereafter, Teal began to work for Corizon. With his new employer, Teal assumed a leadership position similar to his previous role at Armor.

24.     Though unknown to Armor at the time of his departure, Teal took his Armor-owned and Armor-issued laptop with him upon his departure ("Armor Laptop"). The Armor Laptop contained a significant amount of Armor's Confidential Information, including, but not limited to, client materials and information, pricing, business strategies, vendor and provider information.

25.     Soon after Teal joined Corizon (and still within the time periods of his post-employment obligations), on July 1, 2019, one of Armor's important clients, Brevard, gave notice that it was terminating its business arrangement with Armor. While employed by Armor, Teal had been the point person in securing and maintaining Armor's business relationship with Brevard. Tellingly, Brevard's premature termination of the agreement was surprising to Armor as the original contract term was until September 30, 2020; thus, there remained approximately eighteen (18) months under the agreement with Brevard. Brevard's contract with Armor will terminate on February 1st, 2020, with Corizon set to assume immediate responsibility for Armor's contractual duties to Brevard.

26.     Using his knowledge of Armor's business relationship with Brevard and his access to Armor's Confidential Information, Teal worked behind the scenes to drive a wedge between Armor and Brevard, and interfere with their contractual relationship. Indeed, in direct breach of his restrictive covenant and fiduciary obligations, Teal sought to secure Brevard as a client for Corizon. Teal succeeded and Corizon secured the Brevard contract.

27.     Shockingly, Teal's efforts to divert Armor customers are not limited to Brevard. After conducting a forensic review of Teal's Armor Laptop, Armor discovered that, since Teal left Armor and joined Corizon, Teal has used his Armor Laptop multiple times to access Confidential Information related to several important Armor clients. Using Armor's Confidential Information – which Teal improperly accessed *long after* his employment with Armor - Teal and Corizon have targeted several additional Armor clients.

28.     The forensic analysis conducted by Armor also shows that Teal, after his employment with Armor and during his employment with Armor's competitor, improperly accessed the Armor Confidential Information he absconded with including client and facility-specific revenue

7

and expense reports, pricing and expense information, proposals, provider information, and Armor consultant identity and pricing information.

29.     In particular, on June 23, 24, and 25, 2019 – after Teal became employed by Corizon – Teal accessed numerous Armor files on the lap top containing Armor confidential, proprietary, and trade secret information. Notably, Teal transferred much of this information to thumb drives on those same dates. The confidential, proprietary and trade secret information Teal accessed included: (a) detailed files about Armor's actual and budgeted costs for each of its client's accounts (accessed as recently as June 24, 2019); and (b) detailed revenue and cost figures for Armor's accounts as of end of 2018 (accessed as recently as June 24, 2019); (c) detailed information about Armor's current and estimated future compensation associated with the Brevard County contract.

30.     Additionally, the forensic analysis uncovered a document prepared by Teal (titled "Teal 2019 Targets"), that contains (a) detailed financial information regarding Armor's clients, including profits, costs, revenue; (b) probability of success in stealing the client for Corizon; and (c) specific information regarding individuals at each Armor client whom should or could be contacted and solicited. Upon information and belief, Teal improperly accessed and utilized Armor's confidential, proprietary and trade secret information to create this document.

31.     Incredibly, Armor has learned that Teal did not stop at absconding with the Armor Laptop and confidential, proprietary and trade secret information; Teal actually transferred Armor's information to his new employer's (Corizon) laptop or computer systems.

32.     Besides his covert efforts to undermine Armor's business and contractual relationships, Teal has also acted more overtly. For example, he has acted as the face-to-face, point person for Corizon in securing new business and targeting Armor's clients. As part of these efforts,

Teal has made false, salacious and disparaging remarks regarding Armor to existing Armor clients, and he has physically visited Armor clients in an attempt to divert their business to Corizon.

33.     Specifically, to interfere with Armor's relationship with its client St. John's County, Florida, and thereby steal that client for Corizon, Teal made several false statements about Armor to St. John's County. For example, he falsely stated that Armor was not paying correct rates under Armor's agreement with its client, and that Armor was engaging in a process to undercut or avoid obligations under its agreements with its client. None of these statements are true and were stated by Teal with the sole purpose of stealing Armor's business.

34.     Thus, Teal has directly or indirectly: (a) solicited Armor customer accounts (including, but not limited to, Brevard) and encouraged those accounts to leave Armor in favor of Corizon; (b) diverted or attempted to divert Armor customers away from Armor; (c) worked to steal Armor clients for the benefit of Armor's director competitor; (d) sold, provided, or accepted a request to provide services in competition with Armor to Armor customer accounts; (e) divulged Armor's Confidential Information and used it to solicit/divert/accept business away from Armor.  Armor has been irreparably damaged as a result.

35.     Armor is entitled to recover attorneys' fees and costs for bringing this action as provided under Florida law.

36.     Armor has retained the services of the undersigned law firm and has agreed to pay reasonable attorneys' fees and costs in connection with this matter.

37.     All conditions precedent to bringing this action, if any, have been performed, excused, or otherwise waived.

## COUNT I
**(Temporary and Permanent Injunction to Remedy Breach of Contract)**

38.      Armor restates the allegations in paragraphs 1 through 37.

39.      This is an action for a temporary and permanent injunction pursuant to Federal Rule of Civil Procedure 65, Florida Statutes, § 542.335, Florida Statutes §§ 688.002-03, and other applicable law, based on Teal's breach of his restrictive covenant obligations.

40.      Teal agreed to and signed the Employment Agreement in consideration of his employment, compensation, and benefits with Armor.

41.      The Agreement, by its terms, survives Teal's separation from Armor.

42.      Armor has a legitimate business interest in having, requiring, and enforcing the restrictive covenants prohibiting Teal, during the restricted period, from directly or indirectly: divulging or otherwise using Armor's Confidential Information that was disclosed to Teal during the course of his employment and/or engaging in business activity with an entity that was subject to an existing contract with Armor on the date of Teal's separation from Armor.

43.      Teal had substantial relationships with Armor's clients, knowledge of Armor's prospective clients, and knowledge of Armor's Confidential Information and/or trade secrets and/or proprietary information relating to Armor, all of which enable Armor to foster and maintain ongoing client goodwill and substantial relationships with its actual and prospective clients, and gives Armor a competitive advantage.

44.      Teal breached the Employment Agreement's restrictive covenant obligations by using Armor's Confidential Information and engaging in business activity with existing Armor clients.

45.     Under Fla. Stat. § 542.335, irreparable harm is presumed in this case because Teal breached enforceable restrictive covenants. Moreover, Teal's conduct has and continues to cause Armor irreparable harm, for which it has no adequate remedy at law.

46.     The Employment Agreement's restrictive covenants are reasonable in scope, time, and geographic area.

47.     Armor has a substantial likelihood of success on the merits against Teal and the entry of an injunction will not be contrary to the public health, safety and welfare.

48.     Armor has a clear legal right to a temporary and permanent injunction against Teal.

49.     Granting a temporary and permanent injunction will not harm the public interest.

50.     Teal specifically acknowledged and agreed that injunctive relief is an appropriate remedy for the irreparable harm that Amor will suffer as a result of a breach of the Employment Agreement. *See* Ex. A at ¶ 4(c)(ii).

51.     Unless Teal is restrained and enjoined from further breaches of the restrictive covenants or from otherwise utilizing and/or disclosing Armor's protectable Confidential Information, Armor will continue to be irreparably harmed in the conduct of its business.

**WHEREFORE,** Armor requests that this Court enter a temporary and permanent injunction against Teal as follows:

A.     an order enjoining and restraining Teal from sharing or discussing any of Armor's Confidential Information and trade secrets with any third parties, including Corizon.

B.        an order enjoining and restraining Teal for a period of two years from the date of the Order from directly or indirectly engaging in any business with an entity that was subject to an existing contract with Armor at the time of Teal's separation from Armor:

C.        an order requiring Teal to immediately cease doing any business with any Armor clients that existed during the time of Teal's employment with Armor, including Brevard;an order requiring Teal to reimburse Armor for all attorneys' fees and costs incurred in connection with this action pursuant to Fla. Stat. § 542.335 and all other applicable statutory and/or contractual grounds;

D.        any such other and further relief in law and/or equity that the Court deems just and proper.

## COUNT II
### (Breach of Contract - Damages)

51.        Armor restates the allegations in paragraphs 1 through 37.

52.        Armor and Teal agreed to the terms, conditions, and covenants of the Employment Agreement.

53.        Teal signed the Employment Agreement.

54.        Additionally, the Employment Agreement's restrictive covenants are enforceable because they are reasonable in time and scope and are supported by one or more of Armor's legitimate business interests, including, among other things, Armor's Confidential Information, substantial relationships with existing clients, and Armor's customer goodwill.

55.        Teal breached the restrictive covenants by, directly or indirectly:

a.   divulging Confidential Information to a direct competitor of Armor;

b.   using that Confidential Information to interfere with Armor's client relationships; and

   c. pursuing and engaging in business activity with Armor clients, including, but not limited to Brevard.

   56. Teal's breach of the restrictive covenants has caused Armor to suffer damages.

   57. Further, the Employment Agreement requires Teal to account for and pay over to Armor all compensation, profits, and other benefits which inured to his benefit as a result of his breach of the Employment Agreement.

   58. Armor is entitled to its attorneys' fees and costs incurred in connection with this action pursuant to Fla. Stat. § 542.335 and all other applicable statutory and/or contractual grounds.

   **WHEREFORE**, Armor demands judgment against Teal for breach of contract and for all damages, interest, costs and attorneys' fees and other relief deemed proper by this Court.

**COUNT III**
**(Misappropriation of Trade Secrets Under FUTSA)**

   59. Armor restates the allegations in paragraphs 1 through 37.

   60. As a trusted employee of Armor, Teal was given access to Confidential Information that included Armor's proprietary trade secrets concerning business strategy. This Confidential Information was stored, among other places, on the Armor Laptop issued to Teal.

   61. Upon separating from Armor, and without Armor's knowledge, Teal took his Armor Laptop with him. Since joining his new employer, Corizon, Teal has accessed the Confidential Information stored on the Armor Laptop and used, shared, and/or divulged that Confidential Information to Corizon. Teal intentionally absconded with Armor's Confidential Information and trade secrets and used it for his own gain and in the interests of Corizon.

   62. Armor took reasonable steps to protect its Confidential Information, including having employees, like Teal, sign employment agreements containing restrictive covenants prohibiting disclosure of the Confidential Information. Teal's restrictive covenant obligations

13

specifically prohibited him from disclosing Armor's Confidential Information including trade secrets. Additionally, Armor maintains and enforces employment practices and procedures designed to further protect its confidential, proprietary and trade secret information.

63.     Not being satisfied with only taking Armor's Laptop upon separation, Teal has taken the incredible steps of (a) transferring Armor confidential, proprietary and trade secret information onto his new employer's (Corizon) laptop or computer systems, and (b) utilizing Armor's confidential, proprietary and trade secret information for his and Corizon's benefit, and to the detriment of Armor. Teal's actions indicate a blatant and egregious intention to continue to misappropriate Armor's confidential, proprietary and trade secret information, even after returning Armor's laptop.

64.     Despite Teal, through Corizon's counsel, purportedly "returning" Armor's laptop and information and deleting such information from Corizon's laptop and computer systems, Teal still improperly accessed and utilized Armor's Confidential Information and trade secrets prior to "returning" that information.

65.     Armor has suffered damages as a direct and proximate result of Teal's conduct in misappropriating its trade secrets.

66.     As a result of Teal's misappropriation of Armor's trade secrets, Teal has violated FUTSA. Teal's misappropriation entitles Armor both to damages, where possible, but also to injunctive relief to ensure no further misappropriation of Armor's trade secrets. Specifically, Armor is entitled to injunctive relief instructing the return of its stolen information and assurances that the information will no longer be used by Teal, his employer, or any other entity to whom Teal may have transferred the information.  Further, Teal's misappropriation was

willful and malicious, warranting imposition of exemplary damages pursuant to Fla. Stat. 688.04(2).

**WHEREFORE**, under Florida Statutes Chapter 688, Armor demands judgment against Teal for misappropriating its trade secrets, for injunctive relief preventing further misappropriation and rectifying misappropriation that has already occurred, and for all damages, exemplary damages, interest, costs and attorneys' fees and other relief deemed proper by this Court.

<u>**COUNT IV**</u>
**(Tortious Interference With Armor's Contractual Relationships)**

66.     Armor restates the allegations in paragraphs 1 through 37.

67.     While employed by Armor, Teal assisted with securing and maintaining client relationships.

68.     Upon leaving Armor, Teal used his intimate knowledge of Armor Confidential Information related to Armor client Brevard, in particular, along with other confidential, proprietary and trade secret information that he absconded with upon separating from Armor, to undermine Armor's relationship with Brevard.

69.     Teal, on behalf of Corizon, intentionally induced Brevard to end its working relationship with Armor.  Teal then worked to secure Brevard as a client for Corizon.

70.     Teal's interference with Armor's working relationship with Brevard was intentional, unjustifiable and/or done with malice and/or without privilege.  As a result of the interference, Armor lost at least one valuable client relationship and stands to potentially lose others. Armor would have continued its contractual relationship with Brevard had Teal not interfered.

71.      As a direct and proximate result of Teal's tortious interference, Armor has suffered damages, including but not limited to lost investment, income, profits, and business opportunities.

72.      In addition to the equitable relief sought herein, Armor is entitled to recover those damages which have been caused as a direct and proximate result of Teal's interference with Armor's contractual relationships.

**WHEREFORE**, Armor demands judgment against Teal for tortious interference, and for all damages, interest, costs and attorneys' fees and other relief deemed proper by this Court.

## COUNT V
### (Tortious Interference With Armor's Business Relationships)

73.      Armor restates the allegations in paragraphs 1 through 37.

74.      Upon leaving Armor, Teal used his intimate knowledge of Armor Confidential Information regarding clients, potential clients, vendors, providers, and related business strategies, along with the confidential, proprietary and trade secret information that he absconded with upon separating from Armor, to undermine Armor's relationship with multiple current and potential clients, vendors and providers.

75.      Teal, on behalf of Corizon, has visited multiple Armor clients and potential clients, solicited Armor vendors and providers, and has made salacious and disparaging comments to them regarding Armor. For example, as stated earlier, Teal's false remarks to Armor client St. John's County were intended to convince St. John's County to cease doing business with Armor.

76.      Teal's interference with Armor's working relationship with these clients and potential clients, vendors and providers was intentional, unjustifiable and/or done with malice and/or without privilege. As a result of the interference, Armor lost at least one valuable client,

vendor, provider relationship and stands to potentially lose others. Moreover, Teal's interference has prevented Armor from successfully pursuing various potential clients.

77.     As a direct and proximate result of Teal's tortious interference, Armor has suffered damages, including but not limited to lost investment, income, profits, and business opportunities.

78.     In addition to the equitable relief sought herein, Armor is entitled to recover those damages which have been caused as a direct and proximate result of Teal's interference with its business relationships.

**WHEREFORE**, Armor demands judgment against Teal for tortious interference, and for all damages, interest, costs and attorneys' fees and other relief deemed proper by this Court.

## <u>COUNT VI</u>
### (Breach of Fiduciary Duty)

79.     Armor restates the allegations in paragraphs 1 through 37.

80.     During his employment with Armor, Armor reposed trust and confidence in Teal, and Teal undertook such trust and assumed a duty to protect Armor and its interests.

81.     As a result of Armor providing Teal with Confidential Information, and access to its customer accounts, Teal also had a duty to protect such information, both during and after employment with Armor. This duty owed by Teal to Armor included the duty to preserve Armor customer relationships and accounts, and not to divert those customer accounts for the benefit of an Armor competitor and to the detriment of Armor.

82.     In addition, or alternatively, Teal owed a duty of loyalty to Armor. The fiduciary duty of loyalty owed by Teal to Armor included the duty to protect its relationships with customers that existed at the time of his separation.

17

83.     Teal breached his fiduciary duty to Armor by scheming to solicit and/or divert Armor customers away from Armor, including through using his Armor Laptop to tap into Confidential Information regarding clients and business strategies, soliciting Armor clients on behalf of Corizon and/or providing support to Corizon in its solicitation efforts, and making harmful comments regarding Armor to current Armor clients.

84.     Armor has suffered damages as a direct and proximate result of Teal's breaches of his fiduciary duty owed to Armor. These damages include, but are not limited to, lost profits, damage to goodwill, loss of clients, and the impairment of future earning capacity.

**WHEREFORE**, Armor demands judgment against Teal for breaching his fiduciary duties owed to Armor, and for all damages, interest, costs and attorneys' fees and other relief deemed proper by this Court.

<u>**COUNT VII**</u>
**(Fraudulent Inducement)**

85.     Armor restates the allegations in paragraphs 1 through 37.

86.     Shortly after leaving his employment with Armor Teal represented that he would help Armor towards a potential merger with Corizon. Rather than work on a potential merger, Teal used the opportunity to deceive Armor's leadership that he was not restricted from working for an Armor competitor and then used the opportunity to further his own interests at the expense of Armor.

87.     In addition, Teal's material misrepresentations, which he knew to be false, caused Armor's leadership to agree to the Armor Letter for the sole purpose of effectuating a merger between Armor and Corizon, which acknowledged the mistaken and Teal-induced belief that Teal was not restricted from working for an Armor competitor. Teal induced the Armor Letter so that, rather than work on the potential merger, he could pursue employment with Corizon, a direct competitor of Armor.

88.     Having induced the Armor Letter, Teal did, in fact, obtain employment with Corizon and absconded with Armor's Confidential Information for the betterment of Corizon.

89.     Armor relied on Teal's representations to its detriment and was fraudulently induced into waiving its bargained for post-employment obligation (restricting work for a competitor) imposed on Teal.

90.     Armor has suffered damages as a direct and proximate result of Teal's fraudulent inducement concerning his representations regarding his Employment Agreement and his work for a potential merger.

**WHEREFORE**, Armor demands judgment against Teal for fraudulent inducement, and for all damages, interest, costs and attorney's fees and other relief deemed proper by this Court.

## <u>COUNT VIII</u>

### (Breach of Covenant of Good Faith and Fair Dealing)

91.     Armor restates the allegations in paragraphs 1 through 37.

92.     Teal was employed by Armor as its chief executive. Underlying his employment, he signed an Employment Agreement, in which he agreed to post-employment restrictive covenants and to maintain the confidentiality of Armor's proprietary information.

93.     In addition to his role as chief executive, Teal also represented to Armor that he would work to effectuate a merger with Corizon.

94.     Teal, however, had no intention of acting in good faith to effectuate the merger. Instead, he used the opportunity for his own gain. Despite the express terms of his Employment Agreement, Teal stole Armor's Confidential Information and worked to secure Armor clients for Corizon. He has since left Armor for employment with Corizon and has actively worked to interfere with Armor's clients and other relationships.

95.     Consequently, Teal has acted arbitrarily, capriciously, and inconsistent with the expectations of his agreements with Armor.

96.     Because of Teal's deliberate actions for his own gain, Armor has been denied the benefit of its agreements with Teal.

97.     As a result of Teal's actions, Armor has suffered damages.

**WHEREFORE**, Armor demands judgment against Teal for breach of the covenant of implied faith and good dealing, and for all damages, interest, costs and attorney's fees and other relief deemed proper by this Court.

## COUNT IX
### (Violation of the Computer Fraud and Abuse Act)

98.     Armor restates the allegations in Paragraphs 1 through 37.

99.     The Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), creates a private cause of action against anyone that: (a) "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer"; which causes (b) "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. §§ 1030(a)(2)(C), (g), (c)(4)(A)(i)(I).

100.    A "protected computer" is defined to include "a computer  . . . which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States." 18 U.S.C. § 1030(e)(2)(B).

101.    "Loss" is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program,

system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

102.    The term "exceeds authorized access" means to access a computer with authorization and to use such access to obtain or alter the information in the computer that the accessor is not entitled to so obtain or alter.  18 U.S.C. § 1939(e)(6).

103.    Teal violated the CFFA by exceeding his authorization to access the Armor Laptop, which is a protected computer, by accessing and misappropriating, for his own benefit and the benefit of his new employer Armor's Confidential Information.  Teal did not have the authority to access Armor's Confidential Information for any other purpose than to benefit Armor.

104.    Teal's violations of CFFA caused Armor substantially more than $5,000 in losses over a 12-month period.  Among other things, Armor was required to hire attorneys and computer forensic experts to investigate and attempt to mitigate Teal's misappropriation of Armor's Confidential Information.

105.    Teal's unlawful access to the Armor Laptop has also caused Armor irreparable injury. Unless restrained and enjoined, Teal will continue to utilize the information he improperly accessed and retained Confidential Information and continue to reap the benefits of such previously unauthorized access.  Armor's remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling Armor to remedies including injunctive relief as provided by Section 103(g).

**WHEREFORE**, Armor demands and prays for the following relief:

A. Declare that the actions of Teal, set out above, violate the CFAA;

B. Award injunctive and equitable relief including, *inter alia* (i) prohibiting Teal from engaging in the acts alleged above; (ii) requiring Teal to disgorge all of his ill-gotten gains; (iii)

requiring Teal to delete and return all surreptitiously or otherwise collected data through the acts alleged above;

    C.    Award damages to Armor in an amount to be determined at trial;

    D.    Award Armor its reasonable litigation expenses and attorneys' fees;

    E.    Award Armor pre- and post-judgment interest, to the extent allowable;

    F.    Enter injunctive and/or declaratory relief as is necessary to protect Armor's interests; and

    G.    Award such other and further relief as equity and justice may require.

## COUNT X

### (Violation of the Stored Communications Act)

106.    The allegations contained in paragraphs 1 to 37 set forth above are incorporated as if fully set forth herein.

107.    The Stored Communications Act, 18 U.S.C. § 2701 *et seq*., creates a private right of action against anyone who "intentionally accesses without authorization a facility through which an electronic communication service is provided; or [] intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage." 18 U.S.C. § 2701(a).

108.    A facility through which an electronic communication service is provided includes computer servers, networks or systems.

109.    All of Armor's Confidential Information that is stored in, and provided through, Armor's computers or computer servers, networks, or systems, are "electronic communications" within the meaning of the Stored Communications Act as they are housed in, and transmitted to, servers connected to the internet. 18 U.S.C. §§ 2711, 2510(12).

110.    Armor's computer servers, networks or systems are facilities through which an electronic communication server is provided as defined by the Stored Communications Act because they are connected to the internet and run programs which provide the ability to send and receive wire or electronic communications.  18 U.S.C. §§ 2711, 2510(15).

111.    The Armor Laptops is an "electronic storage" facilities as defined by the Stored Communications Act because they provide a means for the storage of electronic communications, and provide a backup copy of those communications. 18 U.S.C. §§ 2711, 2510(17)(A).

112.    At various times after he left employment with Armor, Teal, acting on behalf of himself and Corizon, knowingly and intentionally accessed the Armor Laptop, and downloaded and transferred information to himself and Corizon to obtain and misappropriate Armor's Confidential Information to assist with, among other things, Teal's ability to maximize his earnings at Corizon and to obtain Armor's accounts.

113.    Teal improperly exceeded his authorization to access the Armor Laptop by accessing and misappropriating, for his own benefit and for the benefit of Corizon and at Armor's expense, Armor's Confidential Information.  Teal was not authorized to access the Armor Laptop for this purpose.

114.    Teal thereby intentionally and improperly obtained access to wire or electronic communications while they were in electronic storage in Armor's computers or computer servers, networks or systems.

115.    Armor was aggrieved by Teal's actions, which were in violation of 18 U.S.C. § 2701(a), including the diminishment of the economic value of trade secrets, confidential and proprietary information and infringement upon the confidentiality of Armor's information.

**WHEREFORE**, Armor respectfully requests the following relief against Teal in accord with 18 U.S.C. § 2707(b):

A.      Enter judgment for Armor and against Teal on Count X of the Second Amended Complaint.

B.      Order Teal to provide a full accounting as to the whereabouts of all Armor's Confidential Information in his possession;

C.      Enter a permanent injunction against Teal enjoining him from using, revealing, reporting, publishing, disclosing, transferring or misappropriating any of Armor's Confidential Information;

D.      Enter a mandatory injunction requiring Teal to return to Armor any and all written materials, including copies thereof, and/or flash drives, thumb drives, external hard drives, USB storage drives, computer disks, diskettes, databases and/or other retrievable data which reflect, refer, or relate to Armor's Confidential Information, and any copies that are in Teal's possession, custody, or control;

E.      Award money damages and all of Armor's economic and consequential damages, including attorney's fees and costs, incurred in investigating and responding to Teal's Stored Communications Act violations;

F.      Award $1,000 in statutory damages for each of Teal's Stored Communications Act violations;

G.      Award punitive damages for Teal's Stored Communications Act violations;

H.      Award Armor's costs and reasonable attorney's fees; and

I.      Award such other and further relief that this Court determines to be just and proper under the circumstances.

## **RESERVATION OF RIGHTS**

Armor reserves the right to amend this pleading once its investigation into Defendant's wrongdoing and violation of applicable law has been completed and reserves the right to seek all other applicable damages, including punitive damages.

## **DEMAND FOR JURY TRIAL**

Armor demands trial by jury on all issues and causes of action so triable as a matter of law.

Dated:                                      Respectfully submitted,

By: */s/*_____
        Jessica T. Travers, Esq.
        Florida Bar No. 18129
        Email: jessica.travers@akerman.com
        AKERMAN LLP
        50 North Laura Street, Suite 3100
        Miami, FL 32202
        Telephone: 305-374-5600
        Facsimile: 305-374-5095

        *and*

        Kimberly Rivera, Esq.
        Florida Bar No. 84552
        E-mail:  Kimberly.Rivera@akerman.com
        **AKERMAN LLP**
        98 Southeast 7th Street, Suite 1100
        Miami, Florida 33131
        Telephone: (305) 374-5600
        Facsimile: (305) 374-5095
        *Counsel for Plaintiff, Armor Health Care Services, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that on _____, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel and parties of record identified on the below Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

<u>/s/      </u><br>
Jessica T. Travers<br>
Florida Bar No. 0018129

## <u>SERVICE LIST</u>
### *Armor Correctional Health Services, Inc. v. Bruce Teal*
### CASE NO. 1:19-CIV-24656-KING/BECERRA

**Russell B. Morgan**
Bradley, Arant, Boult, Cummings, LLP
1600 Division Street, Suite 700
Nashville, TN 37203
(615) 252-2311
Email: rmorgan@bradley.com

**David W. A. Chee**
Carlton Fields
100 SE Second Street
Suite 4200
Miami, FL 33131
(202) 603-2425
Email: dchee@carltonfields.com

*Counsel for Defendant*

EXHIBIT "A"

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (the "Agreement") is entered into on March 1, 2006 (the "Commencement Date") by and between Armor Correctional Health Services, Inc., a Florida corporation (the "Corporation"), and Bruce Teal, an individual residing at 112 Hidden Point, Hendersonville, Tennessee 37075 (the "Executive") under the following terms and conditions:

## RECITALS:

WHEREAS, the Corporation desires to employ the Executive in the capacity hereinafter stated, and the Executive desires to enter into the employ of the Corporation in such capacity for the period and on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth below, it is hereby covenanted and agreed by the Corporation and the Executive as follows:

1.      <u>Employment Period</u>.  The Corporation hereby agrees to employ the Executive as its Executive Vice President and Chief Financial Officer of the Corporation and the Executive, in such capacities, agrees to provide services to the Corporation for the period beginning on the Commencement Date and ending on the third (3rd) anniversary of the Commencement Date (the "<u>Employment Period</u>").  The Employment Period shall continue until the next anniversary of the Commencement Date, unless the Corporation or the Executive gives written notice to the contrary to the Executive or the Corporation, respectively, at least sixty (60) days prior to the third (3rd) anniversary of the Commencement Date.

2.      <u>Performance of Duties</u>.  The Executive agrees that during the Employment Period, while he is employed by the Corporation, he shall devote his full time, energies and talents exclusively to serving in the capacities of Executive Vice President and Chief Financial Officer of the Corporation  in the best interests of the Corporation reporting directly to the Chief Financial Officer of Medical Care Consortium, Inc. (the "<u>MCCI CFO</u>") and the Board of Directors of the Corporation (the "<u>Board</u>"), which reporting responsibility shall not be changed without the prior written consent of the Executive, and to perform the duties assigned to him by the MCCI CFO and the Board faithfully, efficiently and in a professional manner.  The Executive shall not, without prior written consent from the Board (which consent shall not be unreasonably withheld):

    (a)      serve as or be a consultant to or employee, officer, agent or director of any corporation, partnership or other entity other than the Corporation (other than civic, charitable, or other public service organizations); or

    (b)      have more than a five percent (5%) ownership interest in any enterprise other than the Corporation if such ownership interest would have a material adverse effect upon the ability of the Executive to perform his duties hereunder.  The Corporation hereby approves the Executive's ownership percentage of Correctional Medical Management, LLC ("<u>CMM</u>") as of the date hereof; <u>provided</u>, <u>however</u>, that the Executive shall not own or purchase directly or

indirectly any additional capital stock or securities convertible in capital stock of CMM (other than shares of capital stock issued upon a stock split or stock dividend) without the prior written consent of the Corporation.

3.    Compensation.  Subject to the terms and conditions of this Employment Agreement, during the Employment Period, while he is employed by the Corporation, the Executive shall be compensated by the Corporation for his services as follows:

(a)    The Executive shall receive, for the first 12-consecutive month period beginning on the Commencement Date a salary of $210,000, payable in substantially equal monthly or more frequent installments and subject to normal tax withholding and $230,000 commencing the 13th month of employment. Annual increases for subsequent years will be negotiated prior to the Executive's anniversary date.

(b)    The Executive shall be eligible to receive the following incentive compensation payments:

(i)    In the event of a Change in Control (as defined in paragraph 5(f)) or a distribution of the Corporation's net profits to the Corporation's majority shareholder (other than for the repayment of a shareholder loan or tax purposes or tax distributions), the Executive shall be entitled to receive an amount equal to five percent (5%) of the aggregate proceeds and/or consideration received by the Corporation and/or the majority shareholder of the Corporation, as the case may be; provided, however, that the Executive shall be employed by the Corporation on the date of such Change in Control or distribution.

(ii)    In the event the Corporation enters into a contract with the State of Mississippi with respect to the Corporation's business and operations and the net profits as determined by the Board in its sole and absolute discretion (the "Net Profits") from such contract are at least 3.5% for any calendar year (the "Net Profits Threshold"), CMM shall be entitled to receive $120,000 ("Net Profits Bonus").

(c)    The Executive shall be a participant in the following executive benefit plans maintained by the Corporation on substantially the same terms and conditions as other senior executives of the Corporation: [group life insurance, group medical, long-term disability, thrift, pension, vacation, sick days, educational assistance, attendance awards and annual medical physical].

(d)    The Executive shall be reimbursed by the Corporation for all reasonable business, promotional, travel and entertainment expenses incurred or paid by the Executive during the Employment Period in the performance of his services under this Employment Agreement to the extent that such expenses do not exceed the amounts allocable for such expenses in budgets that are approved from time to time by the Corporation.  In order that the Corporation reimburse the Executive for such allowable expenses, the Executive shall furnish to the Corporation, in a timely fashion, written documentation in connection with such expenses

and shall furnish such other documentation and accounting as the Corporation may from time to time reasonably request.

4.     <u>Restrictive Covenants</u>.  The Executive acknowledges and agrees that: (i) the Executive has a major responsibility for the operation, development and growth of the Corporation's business; (ii) the Executive's work for the Corporation has brought him and will continue to bring him into close contact with confidential information of the Corporation and its customers; and (iii) the agreements and covenants contained in this paragraph 4 are essential to protect the business interests of the Corporation and that the Corporation will not enter into the Employment Agreement but for such agreements and covenants.  Accordingly, the Executive covenants and agrees to the following:

(a)     <u>Confidential Information</u>.  Except as may be required by the lawful order of a court or agency of competent jurisdiction, the Executive agrees to keep secret and confidential, both during the Employment Period and during the two years after the Executive's employment with the Corporation terminates, all non-public information concerning the Corporation and its affiliates that was acquired by, or disclosed to, the Executive during the course of his employment by the Corporation or any of its affiliates, including information relating to customers (including, without limitation, credit history, repayment history, financial information and financial statements), costs, and operations, financial data and plans, whether past, current or planned and not to disclose the same, either directly or indirectly, to any other person, firm or business entity, or to use it in any way; <u>provided</u>, <u>however</u>, that the provisions of this paragraph 4(a) shall not apply to information that: (a) was, is now, or becomes generally available to the public (but not as a result of a breach of any duty of confidentiality by which the Executive is bound); (b) was disclosed to the Executive by a third party not subject to any duty of confidentiality to the Corporation prior to its disclosure to the Executive; or (c) is disclosed by the Executive in the ordinary course of the Corporation's business as a proper part of his employment in connection with communications with customers, vendors and other proper parties, provided that it is for a proper purpose solely for the benefit of the Corporation.  The Executive further agrees that he shall not make any statement or disclosure that (i) would be prohibited by applicable Federal or state laws, or (ii) is intended or reasonably likely to be detrimental to the Corporation or any of its subsidiaries or affiliates.

(b)     <u>Non-Competition</u>.  The Executive agrees that for the period commencing on the Commencement Date and ending upon expiration of (i) one year after the Executive's employment with the Corporation terminates, the Executive shall not directly or indirectly, alone or as a partner, officer, director, employee, consultant, agent, independent contractor, member or stockholder of any person or entity ("Person"), engage in any business activity in the State of Florida, the State of Mississippi or any other State in which the Corporation conducts its Business, which is directly or indirectly in competition with the Business of the Corporation or which is directly or indirectly detrimental to the Business or business plans of the Corporation or its affiliates, and (ii) two years after the Executive's employment with the Corporation terminates, the Executive shall not directly or indirectly, alone or as a partner, officer, director, employee, consultant, agent, independent contractor, member or stockholder of any Person, engage in any business activity with any Person that is subject to an existing contract on the termination date of the Executive's employment with the Corporation (items (i) and (ii) shall be

referred as the "Non-Competition Period"). The "Business" of the Corporation shall mean the actual business of the Corporation during the Employment Period and as of the date the Executive leaves the employment of the Corporation. As of the date hereof, the Business of the Corporation is managing and operating medical centers.

(c)     Remedies. If the Executive breaches, or threatens to commit a breach of any of the provisions contained in paragraphs 4(a) and 4(b) (the "Restrictive Covenants"), the Corporation shall have the following rights and remedies, each of which shall be enforceable, and each of which is in addition to, and not in lieu of, any other rights and remedies available to the Corporation at law or in equity.

(i)     The Executive shall account for and pay over to the Corporation all compensation, profits, and other benefits which inure to the Executive's benefit which are derived or received by the Executive or any person or business entity controlled by the Executive, or his relatives, resulting from any action or transactions constituting a breach of any of the Restrictive Covenants.

(ii)     Notwithstanding the provisions of subparagraph 4(c)(i) above, the Executive acknowledges and agrees that in the event of a violation or threatened violation of any of the Restrictive Covenants, the Corporation shall have no adequate remedy at law and shall therefore be entitled to enforce each such provision by temporary or permanent injunction or mandatory relief obtained in any court of competent jurisdiction without the necessity of proving damages, posting any bond or other security, and without prejudice to any other rights and remedies that may be available at law or in equity, and the Corporation shall also be entitled to recover its attorneys' fees and costs incurred to enforce any of the Restrictive Covenants from the Executive.

(d)     Severability. If any of the Restrictive Covenants, or any part thereof, are held to be invalid or unenforceable, the same shall not affect the remainder of the covenant or covenants, which shall be given full effect, without regard to the invalid or unenforceable portions. Without limiting the generality of the foregoing, if any of the Restrictive Covenants, or any part thereof, are held to be unenforceable because of the duration of such provision or the area covered thereby, the parties hereto agree that the court making such determination shall have the power to reduce the duration and/or area of such provision and, in its reduced form, such provision shall then be enforceable.

(e)     Proprietary Rights. The Executive acknowledges and agrees that all know-how, documents, reports, plans, proposals, marketing and sales plans, client lists, client files, and any materials made by the Executive or by the Corporation are the property of the Corporation and shall not be used by the Executive in any way adverse to the Corporation's interests. The Executive shall not deliver, reproduce or in any way allow such documents or things to be delivered or used by any third party without specific direction or consent of the Board. The Executive hereby assigns to the Corporation any rights which he may have in any such trade secret or proprietary information.

5. <u>Termination and Compensation Due Upon Termination</u>. Except as otherwise provided under the executive benefit plans maintained by the Corporation in which the Executive participates in accordance with subparagraph 3(c), the Executive's right to compensation for periods after the date the Executive's employment with the Corporation terminates shall be determined in accordance with the following:

(a) <u>Termination Without Cause or for Good Reason</u>. In the event the Corporation terminates the Executive's employment under this Agreement without cause (as defined in subparagraph 5(c) below) or the Executive terminates his employment for Good Reason (as defined in this subparagraph), the Corporation shall pay the Executive any compensation and benefits the Corporation owes to the Executive pursuant to paragraph 3 through the effective date of termination. As used in this Agreement, "Good Reason" shall mean any one or more of the following: (i) the Corporation's failure to comply with any provisions of paragraph 3 of this Agreement, (ii) any material adverse change in the status, position, duties or responsibilities of Executive, (iii) the Corporation's failure to assign this Agreement to its successor or the successor's failure to explicitly assume this Agreement, or (iv) the relocation of the Executive's office outside of Dade County, Florida. Additionally, and conditioned upon the Executive's voluntary execution of a written release (to be drafted and provided by the Corporation) of any and all claims, including without limitation any claims for lost wages or benefits, stock options, compensatory damages, punitive damages, attorneys' fees, equitable relief, or any other form of damages or relief the Executive may assert against the Corporation, the Executive shall be entitled to receive:

(i) all payment of his salary (as of the date of termination) in accordance with the provisions of subparagraph 3(a) for the lesser of (A) twelve (12) months or (B) the remainder of the Employment Period, but in no event less than twelve (12) months; and

(ii) payment of any incentive compensation payments that otherwise would have been payable to the Executive under subparagraph 3(b) through the effective date of termination.

(b) <u>Voluntary Resignation</u>. The Executive may terminate his employment with the Corporation for any reason (or no reason at all) at any time by giving the Corporation sixty (60) days prior written notice of voluntary resignation; provided, however, that the Corporation may decide that the Executive's voluntary resignation be effective immediately upon notice of such resignation. The Corporation shall have no obligation to make payments to the Executive in accordance with the provisions of paragraph 3 for periods after the date on which the Executive's employment with the Corporation terminates due to the Executive's voluntary resignation. However, for purposes of this paragraph 5, the Executive's termination of employment with the Corporation shall not be construed as a voluntary resignation if the Executive resigns for Good Reason.

(c) <u>Termination for Cause</u>. The Corporation shall have no obligation to make payments to the Executive in accordance with the provisions of paragraph 3 or otherwise for periods after the Executive's employment with the Corporation is terminated on account of the

Executive's discharge for cause. For purposes of this paragraph 5, the Executive shall be considered terminated for "cause" if he is discharged by the Corporation on account of the occurrence of one or more of the following events during the Employment Period:

(i)     the Executive becomes habitually addicted to drugs or alcohol;

(ii)    the Executive discloses confidential information in violation of paragraph 4(a) or engages in competition in violation of paragraph 4(b);

(iii)   the Corporation is directed by regulatory or governmental authorities to terminate the employment of the Executive or the Executive engages in activities that cause actions to be taken by regulatory or governmental authorities that have a material adverse effect on the Corporation;

(iv)   the Executive is indicted of a felony crime (other than a felony resulting from a minor traffic violation);

(v)    the Executive flagrantly disregards his duties under this Employment Agreement after (A) written notice has been given to the Executive by the Board that it views the Executive to be flagrantly disregarding his duties under this Agreement and (B) the Executive has been given a period of ten (10) days after such notice to cure such misconduct. However, no notice or cure period shall be required if Executive's disregard of his duties has materially and adversely affected the Corporation;

(vi)   any event of egregious misconduct involving serious moral turpitude to the extent that, in the reasonable judgment of the Board, the Executive's credibility and reputation no longer conform to the standard of the Corporation's executives;

(vii)  the Executive commits an act of fraud against the Corporation, violates a duty of loyalty to the Corporation or violates paragraph 2; or

(viii) the Executive commits a material breach o this Agreement which is not cured to the Board's reasonable satisfaction within thirty (30) days after written notice thereof to the Executive.

(d)    <u>Disability</u>. The Corporation shall have no obligation to make payments to the Executive in accordance with the provisions of paragraph 3 for periods after the date the Executive's employment with the Corporation terminates on account of disability, except payments due and owing through the effective date of termination. For purposes of this subparagraph 5(d), determination of whether the Executive is disabled shall be determined in accordance with the Corporation's long term disability plan (if any) and applicable law.

(e)    <u>Death</u>. The Corporation shall have no obligation to make payments to the Executive in accordance with the provisions of paragraph 3 for periods after the date of the Executive's death, except payments due and owing as of such date.

(f)     Change in Control.  Notwithstanding the provisions of 5(b) above, in the event that the Executive's employment is terminated within twelve (12) month of a Change in Control (as defined in this subparagraph), the Executive shall receive the payment of his salary (as of the date of termination) in accordance with the provisions of subparagraph 3(a) for six (6) months, and payment of any incentive compensation payments that otherwise would have been payable to the Executive under subparagraph 3(b) through the effective date of termination.  As used in this Agreement, "Change in Control" shall mean (i) a merger, an acquisition or series of acquisitions, or consolidation of the Corporation, in which the stockholders of the Corporation do not control fifty percent (50%) or more of the total voting power of the surviving entity (other than a mere reincorporation merger); or (ii) the sale, transfer or other disposition of all or substantially all of the Corporation's assets in liquidation or dissolution of the Corporation.

6.   .    Successors.  This Agreement shall be binding on, and inure to the benefit of, the Corporation and its successors and assigns and any person acquiring, whether by merger, consolidation, purchase of all or substantially all of the Corporation's assets and business, or otherwise without further action by the Executive; provided however, that Executive hereby agrees to execute an acknowledgement of assignment if requested to do so by the successor, assign or acquiring person.

7.     Nonalienation.  The interests of the Executive under this Agreement are not subject to the claims of his creditors, other than the Corporation, and may not otherwise be voluntarily or involuntarily assigned, alienated or encumbered except to the Executive's estate upon his death.

8.     Waiver of Breach.  The waiver by either the Corporation or the Executive of a breach of any provision of this Agreement shall not operate as, or be deemed a waiver of, any subsequent breach by either the Corporation or the Executive.

9.     Notice.  Any notice to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given when received or, when deposited in the U.S. mail, certified or registered mail, postage prepaid:

(a)     to the Executive addressed as follows:

_____
_____
_____

(b)     to the Corporation addressed as follows:

Armor Correctional Health Services, Inc.
3191 Coral Way
Suite 303
Miami, Florida 33145
Attention:  Chief Executive Officer

Facsimile:  (305) 461-5911

10.     Amendment.  This Agreement may be amended or canceled by mutual agreement of the parties in writing without the consent of any other person and no person, other than the parties hereto (and the Executive's estate upon his death), shall have any rights under or interest in this Agreement or the subject matter hereof.  The parties hereby agree that no oral conversations shall be deemed to be a modification of this Agreement and neither party shall assert the same.

11.     Applicable Law.  The provisions of this Agreement shall be construed in accordance with the internal laws of the State of Florida.

12.     WAIVER OF JURY TRIAL.  THE EXECUTIVE AND THE CORPORATION EXPRESSLY WAIVE ANY RIGHT EITHER MAY HAVE TO A JURY TRIAL CONCERNING ANY CIVIL ACTION THAT MAY ARISE FROM THIS AGREEMENT, OR THE RELATIONSHIP OF THE PARTIES HERETO.

13.     Termination.  All of the provisions of this Agreement shall terminate after the expiration of the Employment Period, except that paragraph 4(a) shall survive indefinitely and paragraph 4(b) shall terminate upon the expiration of the Non-Competition Period.

*     *     *

IN WITNESS WHEREOF, the Executive and the Corporation have executed this Employment Agreement as of the day and year first above written.

**BRUCE TEAL**

**ARMOR CORRECTIONAL HEALTH SERVICES, INC.**

By:

Name:

Title: