# EXHIBIT 3

56819332;1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                    MIAMI DIVISION

 3         CASE NO. 1:19-CIV-24656-KING/BECERRA

 4
    ARMOR CORRECTIONAL HEALTH
 5  SERVICES, INC.,

 6         Plaintiff,

 7  vs.

 8  BRUCE TEAL,

 9         Defendant.
    _____/
10

11
                              AKERMAN LLP
12                            98 Southeast Seventh Street
                              Suite 1100
13                            Miami, FL 33131
                              Wednesday, 9:00  a.m.
14                            June 24, 2020

15

16

17        VIDEOTAPED DEPOSITION OF DR. JOSE ARMAS

18

19        Taken before Marvalencia Miller, Florida

20  Professional Reporter, Notary Public in and for the

21  State of Florida at Large, pursuant to Notice of

22  Taking Deposition filed in the above case.

23

24

25
```



```
 1   APPEARANCES:

 2


 3   ON BEHALF OF THE PLAINTIFF:
     AKERMAN, LLP
 4   50 N Laura St
     Suite 3100
 5   Jacksonville, FL 32202-3659
     BY:  Jessica Theresa Travers, Esquire
 6
     ON BEHALF OF THE DEFENDANT:
 7   BRADLEY, ARANT, BOULT, CUMMINGS, LLP
     1600 Division Street
 8   Suite 700
     Nashville, TN 37203
 9   BY:  Russell B. Morgan, Esquire

10
     ALSO APPEARING: Matthew Levia, Videographer
11   Santhia Curtis Appeared Remotely
     Kimberly Ingram Appeared Remotely
12   Kimberly Rivera Appeared Remotely

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                        - - - - - -

 2                          I N D E X

 3                        - - - - - -

 4

 5     DR. JOSE ARMAS                                    PAGE
          By Mr.  Russell Morgan                          5
 6        By Ms.  Jessica Travers                         93

 7              DEFENDANT'S EXHIBITS

 8

 9    NUMBER     DESCRIPTION                            PAGE
      No.  1    Jose "Pepe" Armas Background           8
10    No.  2    ACHS Website                            15
      No.  3    Confidentiality Agreement               16
11    No.  4    Armor Employment Manual                 33
      No.  5    Excerpt from Johnsons'                  45
12               Website
      No.  6    E-mail/October 17, 2018                 53
13               FW: Resignation
      No.  7    E-mail/February 26, 2019                62
14               Armor Correctional-Due
                 Diligence **AEO**
15    No.  8    Multiple Documents                      70
      No.  9    Notice of Termination                   74
16               February 7, 2019
      No. 10    Cancelling the Agreement                75
17               February 22, 2019
      No. 11    Declaration of Rick Staly               76
18

19

20

21

22

23

24

25
```



```
 1   (Thereupon, the following proceedings were had)
 2              THE VIDEOGRAPHER:  Good morning.  We
 3        are on video record.  The time is 9:14 A.M.
 4        in the video deposition of Dr. Jose Armas.
 5              Good morning.  We are now on video
 6        record.  The time is 9:15 A.M. in the video
 7        deposition of Dr. Jose Armas.  Will counsel
 8        please introduce yourselves and thereupon
 9        the witness will be sworn in?
10              MR. MORGAN: My Name is Russell Morgan
11        on behalf of Bruce Teal.
12              MS. TRAVERS:  Jessica Travers on
13        behalf of Akerman LLP for the Plaintiff,
14        Armor Correctional Health Services.
15              MR. ARMAS:  Good morning. Alfredo
16        Armas here as counsel for Dr. Armas.
17              MS. TRAVERS:  And also appearing is
18        Mr. Otto Campo, Armor's CEO, and remotely,
19        Ms. Santhia Curtis, Armor's general
20        counsel.
21              MR. MORGAN:  And Kimberly Ingram is
22        also appearing remotely.
23
24
25
```



```
 1  Thereupon,.
 2                    DR. JOSE ARMAS,
 3  was called as a witness and, having been first duly
 4  sworn, was examined and testified as follows:
 5              THE WITNESS:  Yes.
 6                  DIRECT EXAMINATION
 7  BY MR. MORGAN:
 8         Q.    Would you state your full name for the
 9  record please, sir?
10         A.    Jose J. Armas.
11         Q.    You're Dr. Armas?  Is it okay if I
12  call you Dr. Armas?
13         A.    Yes, sir.
14         Q.    Dr. Armas, my name is Russ Morgan.
15  I'm an attorney representing Bruce Teal in a
16  lawsuit that's been filed by a company that you own
17  called Armor Correctional Health Services.
18              Thank you for coming in today.  We are
19  in some unusual circumstances.  I'm going to be
20  asking you questions today.  You've probably given
21  depositions in your professional capacity in the
22  past.  None of us have done it with a face mask on,
23  I presume, so I am going to do the best I can to
24  ask clear and concise questions.
25              If you don't understand my question
```



```
 1   was excellent at all the financials.  Had a lot of
 2   confidence in him.
 3           Q.   And you said he became a close
 4   personal friend?
 5           A.   Yes, sir.
 6           Q.   Would you still consider him a friend?
 7           A.   Yes, sir.
 8           Q.   Did he begin as a consultant?
 9           A.   I don't remember that.  He may have,
10   but I don't remember.
11                MR. MORGAN:  I'm going to hand you what
12           I'm going to mark as Exhibit 3.
13                (Thereupon, the Defendant's Exhibit
14           No. 3 was marked for identification.)
15   BY MR. MORGAN:
16           Q.   Take a minute and look over it.
17           A.   Okay.
18           Q.   Okay.  Look over at the last page.
19   Can you identify what Exhibit 3 is for me?
20           A.   It's a confidentiality agreement
21   between Armor Correctional and Corizon.
22           Q.   And what was your purpose for
23   executing this confidentiality agreement?
24                MS. TRAVERS:  Objection, form.
25                THE WITNESS:  The spirit of what we
```



```
 1             were trying to do is that Bruce -- that I
 2             felt comfortable that Bruce could represent
 3             us in conversations with Corizon in order
 4             for us to get a deal.  That was the spirit
 5             of what this was.
 6   BY MR. MORGAN:
 7        Q.   For an acquisition -- Corizon
 8   acquiring Armor?  Or some transaction?
 9        A.   A merger of some sort.  Yes.
10        Q.   Okay.  And if you look over on the
11   last page, it says Jose Armas, M.D., founder and
12   president, and there's a signature?
13        A.   Yes, sir.
14        Q.   Is that your signature?
15        A.   Yes.
16        Q.   Did you review this document before
17   you signed it?
18        A.   My typical -- I don't remember exactly
19   this document, but I do remember relying on Bruce
20   that he didn't have a noncompete, and I remember
21   giving it to my attorney for him to review.
22        Q.   Your attorney reviewed it?
23        A.   Yes, sir.
24        Q.   Which attorney reviewed it?
25        A.   Edward Bertrand.
```



```
 1   transaction between both companies, which I felt
 2   was abused by the CEO of Corizon.
 3        Q.   Why?
 4        A.   Because he used Bruce in order to get
 5   confidential information of existing businesses and
 6   contracts.  That's my understanding of what the
 7   purpose of this lawsuit is.  And as a matter of
 8   fact, went after the business, which violated the
 9   spirit of what we were trying to do.
10        Q.   So when you say that -- so first off,
11   let's clarify.  The contracts that Armor had at
12   that point in time, none of those contracts were
13   confidential.  Correct?  They are all public
14   contracts?
15        A.   There is confidential information in
16   those contracts.  Without question.
17        Q.   No, I'm not talking about in the
18   contract.  I'm talking about who your customers
19   are?  Everybody knows who Armor's customers are?
20        A.   Of course.  No, no.  I agree with
21   that.
22        Q.   You agree with that.  Right?
23        A.   Yes.
24        Q.   I looked at your website and every
25   customer you have or had is listed on the website?
```



```
 1                 MS. TRAVERS:  Objection, form.
 2                 THE WITNESS:  I don't know.
 3    BY MR. MORGAN:
 4           Q.    You are not involved in that?
 5           A.    I suspect it's in HR, but I have no
 6    idea.  It's in the bowels of the company.
 7           Q.    Who would I ask that?
 8           A.    I guess, our attorneys.
 9           Q.    Okay.  This is -- I'm going to mark as
10    Exhibit 4. It's been produced by Armor as the
11    employment manual.
12                 (Thereupon, Defendant's Exhibit No. 4
13           was marked for identification.)
14                 MR. MORGAN: I have got an extra copy,
15           sir, if you'd like.
16                 MS. TRAVERS:  I have an extra copy.
17           Here you go.
18                 THE WITNESS:  This one is definitely
19           my signature.
20    BY MR. MORGAN:
21           Q.    This is your signature?
22           A.    Yes, sir.
23           Q.    How can you tell?
24           A.    I can tell.
25                 MS. TRAVERS:  And Counsel, I do have
```



```
 1              with me the original as well, so...
 2   BY MR. MORGAN:
 3         Q.   And so you signed this document.  Do
 4   you know when you signed it?
 5         A.   No.
 6         Q.   Do you know where you were when you
 7   signed it?
 8         A.   No.
 9         Q.   Do you know whether a signed copy ever
10   got returned to Bruce?
11         A.   No.
12         Q.   You state here -- your title here is
13   CEO and president.  Is that your handwriting that
14   wrote "CEO" and "president"?
15         A.   It looks like my handwriting.
16         Q.   That does look like your handwriting?
17         A.   Yes, sir.
18         Q.   At the time, were you the CEO?
19         A.   I don't remember.
20         Q.   I thought you indicated earlier Doyle
21   Moore was the CEO?
22         A.   That's what I remember.  I don't
23   remember being the CEO, but -- I may have signed as
24   an official, but it has president beside it as
25   well.
```



```
 1            Q.   And this was an employment agreement
 2   for Bruce to serve as executive vice president and
 3   chief financial officer?
 4            A.   Yes, sir.
 5            Q.   Do you know where this employment
 6   agreement was placed after you signed it?
 7            A.   No, sir.
 8            Q.   And you don't know whether it was ever
 9   returned to Bruce?  A copy was returned to Bruce?
10            A.   I see his signature on it.
11            Q.   I know, but my question is if he
12   signed it and sent it to you for signature, do you
13   know if you instructed somebody to make sure he got
14   a copy?
15            A.   No.  That would not be my
16   responsibility.
17            Q.   He testified he never got a copy of
18   it.  So --
19                 MS. TRAVERS:  Objection, form.
20            Mischaracterizes testimony.
21   BY MR. MORGAN:
22            Q.   He testified he never got a copy of
23   the employment agreement.  So I'm asking you
24   whether you asked somebody to send it to him?
25                 MS. TRAVERS:  Objection, form.
```



```
 1              Mischaracterizes testimony.  Just wait a
 2         minute, Dr. Armas.
 3              THE WITNESS:  Yes.
 4              MS. TRAVERS:  Objection, form.
 5         Mischaracterizes testimony.  Now can you
 6         can go.
 7   BY MR. MORGAN:
 8        Q.   Did you ever instruct someone to make
 9   sure they sent a copy of this to Mr. Teal?
10        A.   No.  It usually goes to HR and our
11   attorneys and that's their responsibility.
12        Q.   Do you know where you were when you
13   signed this agreement?
14        A.   No, sir.
15        Q.   Bruce's signature is on here for
16   3/1/2006.  Do you know if you signed it in that
17   time period?
18        A.   I would suspect I did, but I don't
19   know.
20        Q.   You don't even remember signing this.
21   Right?
22        A.   No.  But it is definitely my
23   signature.  That I'm sure.
24        Q.   At some point in time, Bruce was
25   promoted to CEO.  Can you tell me the background
```



```
 1        A.   No idea.  You'll have to talk to my
 2   attorneys.  I don't know.
 3        Q.   Is it filed in Florida?  Or is it
 4   arbitration?
 5             MR. ARMAS:  No.  It's litigation.
 6             MR. MORGAN:  In Florida or Atlanta?
 7   Atlanta.
 8             Okay.  I'm going to hand you what I
 9        marked as Exhibit 6.
10             (Thereupon, the Defendant's Exhibit
11        No. 6 was marked for identification.)
12             THE WITNESS:  I'm sorry?
13   BY MR. MORGAN:
14        Q.   I'm handing you what I marked as
15   Exhibit 6.  Exhibit 6 is an e-mail from you to --
16   excuse me -- from Bruce to you, Fitz Johnson, and
17   Alexander Johnson, with a CC to Ceron Rawls.  Who
18   is Fitz Johnson?
19        A.   One of the Johnson brothers.  I
20   remember him being an attorney.  I don't remember
21   anything other than that.
22        Q.   Who is Alexander Johnson?
23        A.   That's the one you showed me.  The AJ.
24        Q.   Okay.  Who is --
25        A.   That is the supposed CEO.  Who is
```



```
 1  Ceron Rawls?  Or C-E-R-O-N Rawls?
 2         A.   I don't know who that is.
 3         Q.   Do you recall receiving this e-mail
 4  from Bruce?
 5         A.   I don't.
 6         Q.   Do you deny that you received it?
 7         A.   No.
 8         Q.   So did you become aware that Bruce had
 9  tendered, officially, his resignation from Armor?
10         A.   Yes.  At some point.  I don't remember
11  exactly when it happened.
12         Q.   And did you have a conversation with
13  Bruce at that point in time?
14         A.   I don't remember that either.
15         Q.   Okay.  So what happened after Bruce
16  tendered his resignation.  Did he finish working?
17              MS. TRAVERS:  Objection, form.
18              MR. MORGAN:  You can answer.
19              THE WITNESS:  I don't remember.  I
20         don't remember the details right now.
21  BY MR. MORGAN:
22         Q.   What conversations did you have with
23  Bruce following his termination from -- his
24  resignation and leaving the company?  Any?
25         A.   No.  I'm sure we did.  I don't
```



```
 1  remember the details of what we spoke about.  But I
 2  remember him being physically not well, and that he
 3  wanted to retire.  He didn't want anything to do
 4  with the industry.  That I remember from those
 5  conversations.  And suggesting that I should not
 6  either.
 7          Q.   And so what was your next involvement
 8  with Bruce or knowledge of what Bruce was doing
 9  after he left the company?
10          A.   We kept in touch.
11          Q.   How did you keep in touch?
12          A.   Texts, calls, different ways.
13          Q.   Okay.  Did you -- did anybody make any
14  statements that Bruce was saying negative things
15  out in the marketplace about Armor?
16          A.   I heard rumblings.  People would come
17  to me and tell me that.
18          Q.   What were you hearing?
19          A.   That Bruce was meeting with different
20  vendors and stuff like that.
21          Q.   And who -- can you tell me who was
22  telling you this?
23          A.   I don't remember.  I heard it from a
24  few people.
25          Q.   Can you give me any names?
```



```
 1  his laptop?
 2          A.   None.
 3          Q.   Were you aware that Bruce had a laptop
 4  when he left the company?
 5          A.   No.
 6          Q.   Were you aware that he maintained some
 7  information on the laptop to help Lissette with
 8  financial transactions following the time that he
 9  resigned from the company?
10          A.   No, sir.
11          Q.   You didn't ask him to stay involved in
12  that respect?
13          A.   I don't remember.
14          Q.   If Bruce said you did, you wouldn't
15  dispute that?
16          A.   No.
17          Q.   Do you have any knowledge as to how
18  Bruce's employment agreement was located?
19          A.   No, sir.
20          Q.   Were you told it was located?
21          A.   Yes.
22          Q.   Do you know where it was, when it was
23  located?
24          A.   No, sir.
25          Q.   Do you know who located it?
```

