IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO: 1:19-cv-24656-JLK

ARMOR CORRECTIONAL HEALTH
SERVICES, INC.,

     Plaintiff,

v.

BRUCE TEAL,

     Defendant.

_____/

**DEFENDANT BRUCE TEAL'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1(a)(1), Defendant, Bruce Teal, respectfully submits the following facts that are material to his motion for summary judgment:

*Mr. Teal's Employment with Armor*

1. Mr. Teal joined Armor Correctional Health Services, Inc. ("Armor") as a consultant around late 2004. *See* Declaration of Bruce Teal, attached hereto as **Exhibit 1**, at ¶ 2.

2. Mr. Teal was soon promoted to Chief Financial Officer ("CFO"). Ex. 1, ¶ 2.

3. The alleged employment agreement Armor attached to its Complaint is dated March 1, 2006 ("Alleged Agreement"), which was during Mr. Teal's tenure as CFO. *See* ECF No. 22-1 [Ex. A to Second Am. Compl.]; ECF No. 59 [Def.'s Stmt. of Add'l Material Facts in Resp. to Pl.'s Motion for Partial Summ. J., deemed admitted[1]], ¶¶ 52, 57.

4. Neither Mr. Teal nor the other purported signatory, Dr. Armas, remembers signing the Alleged Agreement. *See* Excerpts of Transcript of Deposition of Bruce Teal, attached hereto as **Exhibit 2**, at 94:2–95:24 & 125:7–126:22 (Teal's testimony regarding why he believes the

---

[1] Armor did not respond to this Statement, as required by Local Rule 56.1(b)(3). Mr. Teal's material facts were supported by properly cited record evidence and no exception under Federal Rule 56 applies. *See* ECF No. 59 ¶¶ 52–87. Therefore, pursuant to Local Rule 56.1(c), these facts should be deemed admitted.

**Error! No document variable supplied.**

document is not genuine); Transcript of Deposition of Dr. José Armas, attached hereto as **Exhibit 3**, at 20:22–21:9, 34:3–8, & 36:12–19 (Dr. Armas's testimony as to lack of knowledge as to when or where the Alleged Agreement was signed); ECF No. 59, ¶ 58.

5.      No one at Armor discussed the Alleged Agreement with Mr. Teal until the lawsuit was filed on October 4, 2019. *See* Ex. 1, ¶¶ 10, 16; Ex. 2 at 125:7–18 ("[The Alleged Agreement has] never been mentioned to me, in any instance, of the existence of this until, I guess, it turned out to be part of this lawsuit."); ECF No. 59, ¶ 60.

6.      Mr. Teal was promoted from CFO to Chief Executive Officer ("CEO") around September 2006.  Ex. 1, ¶ 3; ECF No. 59, ¶ 59.

7.      Mr. Teal served as Armor's CEO from approximately September 2006 to approximately April 2018.  Ex. 1, ¶ 3; Ex. 2 at 61:3–20; ECF No. 22, ¶ 10.

8.      While serving as CEO, Mr. Teal took an active role in Armor's finances, preparing and/or reviewing all of its financial statements and pricing proposals.  Ex. 1, ¶ 4; ECF No. 22, ¶¶ 10–11.

9.      Armor did not have a regular practice of requiring executives to execute non-competition agreements from 2006 to 2018. *See* Ex. 1, ¶ 5; Ex. 2 at 100:9–12; ECF No. 59, ¶ 64.

10.      Multiple employees of Armor went to work for competitors from 2006 to 2018. In fact, two former Armor employees involved in client relations and pricing were already working for Corizon when Mr. Teal joined; neither had a non-compete. *See* Ex. 1, ¶ 5; ECF No. 59, ¶ 86.

11.      Out of the eight employment agreements produced by Armor in this action, only two were from this period, and only one had a non-competition provision, which related to a particular payment from Armor. *See* ECF No. 59, ¶ 64; ECF No. 59-10 [declaration regarding facts of production]; ECF No. 59-16 [excerpted employment agreement from 2016].

12.      Even now, Armor's CEO and controller do not have non-competition provisions, and its COO did not have a non-competition provision until 2019. *See* Excerpts of Transcript of Deposition of Lissette Perez, attached hereto as **Exhibit 4**, at 7:20–8:1 & 24:1–5; Excerpts of Transcript of Deposition of Manuel Fernandez, attached hereto as **Exhibit 5**, at 7:12-13; ECF No. 59-5 [Confidential[2] Portion of Fernandez Dep. Tr.] at 19:12–22:12; Excerpts of Transcript of Deposition of Otto Campo, attached hereto as **Exhibit 6**, at 6:10–14; ECF No. 59-15 [Confidential

---

[2] The parties agreed that the unredacted portions of the transcripts previously filed did not need to remain confidential and could be publicly filed.

**Error! No document variable supplied.**

Portion of Campo Dep. Tr.] at 16:15–21; ECF No. 59, ¶ 65.

13. In or around April 2018, Mr. Teal took on a slightly reduced role at Armor as the result of a contemplated sale of Armor to new ownership. Ex. 1, ¶ 6.

14. Mr. Teal resigned from Armor effective on or about November 10, 2018. Ex. 1, ¶ 9; ECF No. 22, ¶ 23; ECF No. 58 [Pl.'s Stmt. of Material Facts in Supp. of Pl.'s Motion for Partial Summ. J.], ¶ 3.

15. When Mr. Teal announced his resignation, no one at Armor mentioned any employment agreement or restrictive covenants, including a non-competition provision, to him. *See* Ex. 1, ¶ 10; ECF No. 59, ¶ 66.

16. Armor also allowed Mr. Teal to keep the laptop that it had purchased for him during his employment and made no effort to remove any information from the laptop. *See* Ex. 1, ¶ 12; Ex. 2 at 79:2–81:15; excerpts of Defendant's March 2, 2020 Interrogatory Answers, attached hereto as **Exhibit 7**, at 7; Ex. 4 [Perez Dep. Tr.] at 22:3–17; Ex. 5 [Fernandez Dep. Tr.[3]] at 128:24–129:9.

17. In December 2018, at Armor's request, Mr. Teal assisted Armor in reviewing and providing feedback on financial statements for November 2018 and the corporate budget for 2019. *See* Ex. 1, ¶ 13; Ex. 2 at 81:11–18, 88:4–12, & 90:17–91:7; Ex. 7 at 7.

18. In connection with the forementioned request, Armor sent Mr. Teal financial information. *See* Ex. 1, ¶ 13; Ex. 7 at 7; Ex. 4 [Perez Dep. Tr.] at 17:23–18:24.

19. Mr. Teal also informed Armor that he was using information in his possession in reviewing financial information in connection with the transaction contemplated with Corizon. *See* Ex. 1, ¶ 13; Ex. 2 at 90:17–91:7.

***Mr. Teal's Employment with Corizon and the Potential Transaction with Armor***

20. Mr. Teal began discussing non-executive employment with Corizon in December 2018. *See* Ex. 1, ¶ 14; ECF No. 59, ¶ 69.

21. Mr. Teal began working with Corizon no later than January 20, 2019, when he attended a sheriff's conference on behalf of Corizon. Ex. 1, ¶ 15; ECF No. 59, ¶ 70.

22. Armor saw Mr. Teal at the January 2019 sheriff's conference and discussed that fact with Mr. Teal. *See* Ex. 1, ¶¶ 15–16; ECF No. 59, ¶¶ 70–71.

---

[3] Mr. Fernandez was Armor's representative for purposes of the Rule 30(b)(6) notice issued to Armor. *See* Ex. 5 at 24:10–25.

**Error! No document variable supplied.**

23.     Shortly after the January 2019 sheriff's conference, Mr. Teal informed both Dr. Armas and Armor's new Chief Executive Officer, Otto Campo, that he was working with Corizon. Neither Dr. Armas nor Mr. Campo mentioned any restrictive covenants or concern that his work for Corizon would violate any duties owed to Armor. *See* Ex. 1, ¶ 16; ECF No. 59, ¶ 71.

24.     During the same January 2019 conversation with Dr. Armas, Mr. Teal and Dr. Armas discussed the possibility of a strategic transaction between Corizon and Armor. *See* Ex. 1, ¶ 16.

25.     Mr. Teal and Otto Campo, Armor's CEO, also discussed this potential transaction. *See* Ex. 1, ¶ 16.

26.     Mr. Teal explained to Mr. Campo that he would try to facilitate this transaction but could not control the terms because although he worked for Corizon, he was not an executive of Corizon.  *See* Ex. 1, ¶ 16.

27.     Armor and Corizon entered into a non-disclosure agreement ("NDA") dated February 5, 2019.  *See* ECF No. 41-1 at 2–5; ECF No. 58, ¶ 24; Ex. 1, ¶ 17.

28.     The NDA stated: "Armor understands that Corizon intends to engage Mr. Bruce Teal and that as part of Mr. Teal's engagement he may assist Corizon with evaluating a possible transaction between Armor and Corizon. Armor confirms that Mr. Teal is not subject to any on-going non-competition, confidentiality, or other agreement with Armor that would prohibit him from working for Corizon or otherwise assisting with a possible transaction, except for such restrictions as are imposed by this Agreement."  ECF No. 41-1 at 2–5.

29.     Armor knew that Mr. Teal had reviewed the NDA at the time when Armor signed the NDA. *See* Ex. 1, ¶ 18; ECF No. 59-6 & 59-7 [Feb. 5, 2019 and Feb. 11, 2019 emails between Mr. Teal and Armor representatives concerning NDA sent to and from Mr. Teal's personal email address (Alexteal@comcast.net)]; ECF No. 59, ¶¶ 72–73.

30.     Mr. Teal did attempt to facilitate a transaction between Armor and Corizon.  *See* Ex. 1, ¶ 20; ECF No. 59-6 & 59-7.

31.     In early March 2019, the deal between Armor and Corizon fell through because Armor and Corizon's leadership had different views on the value of the transaction.  Ex. 1, ¶ 21.

32.     When Armor withdrew from discussions about a strategic transaction with Corizon, it did not notify Corizon or Mr. Teal that it believed Mr. Teal did have restrictive covenants impacting his work with Corizon. *See* Ex. 1, ¶ 21; ECF No. 58-12 [King Dep. Tr.] at 48:2–49:24;

4

**Error! No document variable supplied.**

ECF No. 59, ¶ 75.

33.    Mr. Teal finalized the terms of his employment with Corizon when he accepted its employment offer on April 5, 2019.  Ex. 1, ¶ 22; Ex. 2 at 49:15–51:19; ECF No. 58-15 [Mr. Teal's employment agreement with Corizon] at 4.

34.    Mr. Teal engaged in this employment, which would cause him to compete with Armor, in reliance on Armor's disavowal that he had any restrictive covenant.  *See* Ex. 1, ¶ 22; ECF No. 59, ¶ 74.

35.    Armor sent Mr. Teal a letter dated July 23, 2019, which asked him to cease and desist from certain activities and threatened legal action.  *See* Ex. 1, ¶ 25; ECF No. 58-22 at 2–3 [Armor's July 23, 2019 letter].

36.    The July 23, 2019 letter referred to "common law" duties, but it did not mention an employment agreement or restrictive covenants.  Ex. 1, ¶ 25; ECF No. 58-22 at 2–3 [Armor's July 23, 2019 letter]; ECF No. 59, ¶ 77.

37.    Corizon's General Counsel responded to the July 23, 2019 letter and explained Corizon and Mr. Teal's understanding that Mr. Teal did not have any contractual restrictive covenants.  *See* Ex. 1, ¶ 26; ECF No. 59-17 [Corizon's response to July 23, 2019 letter].

38.    The letter dated August 2, 2019 specifically states that "Armor agrees that Mr. Teal did not enter into any post-employment restrictive covenants that, standing alone, limit Mr. Teal's ability to be employed by a competitor of Armor, like Corizon." ECF No. 58-22 at 4–7 [Armor's Aug. 2, 2019 letter]; ECF No. 59, ¶ 78.

39.    After the August 2, 2019 letter, Corizon mentioned to Armor that Mr. Teal had a laptop that Armor had purchased for him.  *See* ECF No. 58-22 at 8–9 [Armor's Aug. 13, 2019 letter].

40.    Armor thereafter demanded that the Laptop be returned.  *See* ECF No. 58-22 at 8–9 [Armor's Aug. 13, 2019 letter].

41.    Mr. Teal had been using the Laptop as a personal laptop, but he promptly gave the Laptop to his counsel in early August 2019. *See* Ex. 1, ¶ 12; Declaration of Sarah Miller, attached hereto as **Exhibit 8**, ¶ 3.

42.    After discussing a protocol with Armor's counsel, Mr. Teal's counsel removed any Corizon information contained on the Laptop, made a preservation copy, and returned it to Armor. *See* Ex. 8, ¶¶ 4–8.

**Error! No document variable supplied.**

43.     The first time Armor told Corizon or Mr. Teal that Mr. Teal had restrictive covenants it intended to enforce was when Armor filed and served the complaint in this matter. *See* ECF No. 59, ¶ 79; Ex. 1, ¶ 16; Ex. 2 at 125:7–18; *see also* ECF No. 58-12 [King Dep. Tr.] at 48:2–49:24 (describing how Corizon "found it very odd that the agreement didn't show up after Armor made numerous representations that such an agreement didn't exist"); ECF No. 59-17 [Corizon's response to July 23, 2019 letter] (explaining that Corizon knew Mr. Teal did not have such covenants).

44.     Armor claims that Lissette Perez found the Alleged Agreement in either a desk drawer or a cabinet on or about September 17, 2019 when cleaning for a move and that the agreement had been there for thirteen years and been forgotten. *See* Excerpts of Plaintiff's May 13, 2020 Supplemental Interrogatory Answers, attached hereto as **Exhibit 9**, at 28; ECF No. 59, ¶ 80.

45.     Ms. Perez testified she found the Alleged Agreement in a file labeled "BT" in a desk drawer while cleaning. According to Ms. Perez, she put the document there in 2006, and it remained there for the next thirteen years.  Ex. 4 at 8:2–16:10.

46.     Ms. Perez stated that she was not present when the agreement was signed. *See* Ex. 4 [Perez Dep. Tr.] at 8:2–13:21; ECF No. 59, ¶ 81.

### Mr. Teal's Interactions with Current or Former Customers

47.     Every current or former customer of Armor to give a deposition or provide a declaration in this matter has confirmed that Mr. Teal said nothing disparaging about Armor and did not attempt to convince them to terminate Armor. *See* Excerpts of Transcript of Deposition of Brevard County Sheriff Wayne Ivey, attached hereto as **Exhibit 10**, at 9:20–11:11, 15:21–17:8, & 53:12–15; Declaration of Wakulla County Sheriff Jared F. Miller, attached hereto as **Exhibit 11**, at ¶¶ 5–6; Declaration of Flagler County Sheriff Rick Staly, attached hereto as **Exhibit 12**, ¶¶ 5–6; Declaration of Baker County Sheriff Scotty Rhoden, attached hereto as **Exhibit 13**, ¶¶ 5–6; Declaration of Sarasota County Sheriff Thomas Knight, attached hereto as **Exhibit 14**, ¶¶ 5–6; Declaration of St. Johns County Undersheriff Matthew Cline, attached hereto as **Exhibit 15**, ¶¶ 5–7; ECF No. 59, ¶ 84.

48.     Armor has admitted that it has no facts to dispute the statements given by these customers. Ex. 5 at 87:21–88:4 & 139:10–21.

6

**Error! No document variable supplied.**

49. In April 2019, the Sheriff of Brevard County, Wayne Ivey, contacted Mr. Teal and told him that Brevard County Sheriff's Office ("Brevard") was going to issue a Request for Proposal ("RFP") to receive competitive bids from correctional healthcare providers. Ex. 1, ¶ 23; Ex. 2 at 32:19–33:5; ECF No. 58, ¶ 44 (citing deposition transcripts of Bruce Teal and Sheriff Ivey).

50. Sheriff Ivey testified that the decision to terminate the contract between Brevard and Armor was due to Armor's performance and a desire to obtain the best price, and that it was in no way related to Mr. Teal. *See* Ex. 10 at 9:20–11:11 & 15:21–17:8.

51. Mr. Teal participated in the bid process for Brevard as part of Corizon's team between June 2019 and October 4, 2019. Ex. 1, ¶ 24; ECF No. 58, ¶¶ 45–46; Ex. 2 at 29:12–32:13 & 34:25–37:4.

52. On September 6, 2019, Corizon was awarded the Brevard contract. *See* Ex. 1, ¶ 24; ECF No. 58, at 47; ECF No. 58-21 [Sept. 6, 2019 award of Brevard contract to Corizon].

53. Armor alleges that Mr. Teal told its client, the St. Johns County Sheriff's Office ("St. Johns") that Armor was not paying correct rates and "engaging in a process to undercut or avoid obligations under its agreements with its client." ECF No. 22, ¶ 33.

54. Armor identified Jennifer Owens as having knowledge of Mr. Teal's supposed statements to St. Johns. *See* Ex. 9 at 14–15. Ms. Owens confirmed that Mr. Teal told *her* "that he knew that Armor was going to start paying its hospitals Medicare rates," but she did not have any knowledge that he made such a statement to St. Johns. *See* Transcript of Deposition of Jennifer Owens, attached hereto as **Exhibit 16**, at 13:22–16:25.

55. The St. Johns County Undersheriff confirmed that Mr. Teal never made the statements alleged. On the contrary, Mr. Teal "learned that [St. Johns was] considering issuing an RFP and contacted [them], suggesting that [they] calm down and assuring [them] that SJSCO would be in good hands" with Armor. Ex. 15 at ¶¶ 5–7.

56. After Armor filed the original complaint in this matter, Mr. Teal and Corizon agreed to reduce Mr. Teal's job responsibilities to a non-client facing role as a financial analyst. *See* Ex. 1, ¶ 28; Ex. 2 at 18:21–23:5 & 26:5-27:3; ECF No. 59-9 at 31:25–35:2; ECF No. 59, ¶ 83.

### *Armor's Allegations Regarding Damages*

57. Since January 2019, Armor has lost approximately 50% of the contracts that it had during Mr. Teal's tenure, including but not limited to those with Brevard, the Wakulla County

**Error! No document variable supplied.**

Sheriff's Office, the Flagler County Sheriff's Office, and the Sarasota County Sheriff's Office. *See* Ex. 1, ¶ 32; Ex. 5 at 38:7–42:2.

58.     The Wakulla County Sheriff's Office terminated its contract with Armor because it was "not satisfied with the service levels [it] had been receiving from Armor." Ex. 11, ¶ 6; *see also* Ex. 5 at 139:10–21 (admitting Armor had no facts to contest the declarations provided by customers).

59.     The Flagler County Sheriff's Office "cancelled the Armor contract because of its inadequate management of the medical contract at the Sheriff Perry Hall Inmate Detention Facility, which [the Sheriff] believe[s] ultimately contributed to the death of an inmate," and "no one from Armor contacted [the Sheriff's] office to discuss [his] concerns" and instead "authored a letter . . . claiming [he] had over-reacted." Ex. 12, ¶ 6; *see also* Ex. 5 at 139:10–21 (admitting Armor had no facts to contest the declarations provided by customers).

60.     The Baker County Sheriff's Office "made the decision to terminate the contract because [the Sheriff] lost confidence in Armor and [he] lost trust in [Armor]," explaining that "[i]n one incident that occurred, one of the Armor physicians told his employee not to convey information to [him] and to withhold information from [him]" during an investigation. Ex. 13, ¶ 6; *see also* Ex. 5 at 139:10–21 (admitting Armor had no facts to contest the declarations provided by customers).

61.     The Sheriff of Sarasota County declared under oath that he made the decision to terminate the contract with Armor "because [he] was not satisfied with their performance including but not limited to" communications by Armor directed to Sarasota Memorial Hospital and Sarasota County's staff and "[l]ack of proper medical staffing in the jail." Ex. 14, ¶ 6; *see also* Ex. 5 at 139:10–21 (admitting Armor had no facts to contest the declarations provided by customers).

62.     In addition to its withdrawal from Brevard's RFP process, Armor has failed to submit proposals in responses to RFPs issued by other customers who have terminated its existing contracts. *See* Ex. 11, ¶ 7; Ex. 12, ¶ 7.

63.     Armor is only seeking lost profits for the loss of the Brevard contract. Ex. 9 at 22, 30; Ex. 5 at 59:21–60:5 & 122:4–22.

64.     Armor was free to participate in the Brevard bid process. Ex. 1, ¶ 24.

65.     On July 31, 2019, Armor withdrew from Brevard's RFP process. Ex. 1, ¶ 24; ECF No. 58, at 7 n.6; ECF No. 58-20 [Armor's withdrawal letter].

**Error! No document variable supplied.**

66. According to Armor's corporate representative, the Brevard contract "typically made around nine hundred forty, fifty thousand dollars every twelve months" after taking out direct costs. Ex. 5 at 63:7–11.

67. In the last year for which Armor had the contract, by its own calculation, Armor netted only $647,000 due to a $300,000 settlement payment.  Ex. 5 at 64:7–65:6.

68. In discussing Armor's damages calculations, Armor's CEO referred to this settlement payment as an "anomaly." Ex. 6 at 132:18–133:8.

69. However, Armor did not eliminate the possibility that there would have been similar settlements that reduced profit on the Brevard contract in 2020.  Ex. 5 at 65:7–16.

70. Armor admitted that its lost profits figure "does not" "take into account any allocation of overhead and expenses." Ex. 6 at 124:23–126:23; *see also* Ex. 5 at 70:7–77:10 & 125:22–126:18.

71. Armor continued to serve Brevard and therefore was paid through January 31, 2020. Ex. 5 at 63:12–14.

72. Armor's contract would have extended through September 30, 2020 if Brevard had not terminated it.  Ex. 5 at 42:3–21 & 63:15–18; ECF No. 58, ¶ 39.

73. Brevard could choose to extend the contract or not extend the contract past September 30, 2020.  Ex. 5 at 60:9–62:7.

74. Armor had a right to terminate the contract with notice.  Ex. 1, ¶ 31; ECF No. 58-17.

75. As of January 30, 2019, Brevard had already informed Armor that it was planning to put the contract out to bid at the end of the term because "[the sheriff] thinks he can get a cheaper deal." Jan. 30, 2019 email from Ken Palombo, Armor's COO, attached hereto as **Exhibit 17**.

### *Armor's Allegedly Confidential Information*

76. Armor's customers are government entities. *See* Ex. 1, ¶ 33.

77. Much of the information that is sensitive in other businesses, such as pricing and proposals, is publicly available in the correctional healthcare industry, at least through Freedom of Information Act requests. *See* Ex. 1, ¶ 33; Ex. 2 at 53:17–55:16 & 101:15–103:25; ECF No. 59, ¶ 85.

78. Armor's contracts, payments received, and communications with customers are available through public records requests. *See* Ex. 1, ¶ 33; Ex. 2 at 53:17–55:16, 101:15–103:25,

9

**Error! No document variable supplied.**

& 105:23–106:25.

79.     Armor identified the following as the "trade secrets" at issue in this action: "[c]onsolidated and individualized flash reports that included contract days, average population, operating expenses, personnel costs, and patient population metrics for Armor's contracts"; "Armor's balance sheets and income statements that listed assets, liabilities, income, equity, and individualized breakdowns of revenue (budgeted and actual) across Armor's various business lines and contracts"; and "a compensation breakdown under a proposed contract modification scenario for the Brevard County Sheriff's Office." Ex. 9 at 26.

80.     When Mr. Teal was employed as an executive at Armor, there were no meaningful limitations on what Armor information or systems he was permitted to access. *See* Ex. 1, ¶ 35; ECF No. 22, ¶ 11.

81.     All of the information that Armor alleges was proprietary and confidential to Armor on the Laptop and/or external drives was provided to Mr. Teal by Armor when he was employed by Armor. *See* Ex. 1, ¶ 35–36; ECF No. 22, ¶ 11.

82.     Armor never gave Mr. Teal any notice that his authorization to access Armor information or systems had been revoked after his resignation. *See* Ex. 1, ¶ 35.

83.     Armor did not take steps to actually disable Mr. Teal's access to Armor's information or systems, such as remediating the Laptop of Armor information or simply retaining the Laptop, inactivating his Armor accounts, or configuring the file server so that Mr. Teal could not access it. *See* Digital Forensic Examination Report of Donald F. Tennant III, attached hereto as **Exhibit 18**, at 3 ("My review of the non-confidential portions of the deposition transcripts shows that little if any effort was given in limiting Mr. Teal's access to Armor information after his departure from the company and the termination of his financial assistance.").

84.     Mr. Teal did not access any Armor file server or online email system after December 13, 2018.  *See* Ex. 18 at 3.

85.     Armor has not identified specifically how Mr. Teal supposedly used any confidential information, and Mr. Teal denies having done so.  *See* Ex. 1, ¶ 36; Ex. 9 at 26.

**Error! No document variable supplied.**

Dated: May 3, 2021                                   Respectfully submitted,


                                                    */s/ Jennifer Olmedo-Rodriguez*
                                                    Russell B. Morgan (admitted *pro hac vice*)
                                                    rmorgan@bradley.com
                                                    Kimberly M. Ingram (admitted *pro hac vice*)
                                                    kingram@bradley.com
                                                    BRADLEY  ARANT  BOULT  CUMMINGS
                                                    LLP
                                                    1600 Division St, Suite 700
                                                    Nashville, TN 37203
                                                    Telephone: (615) 252-2311
                                                    Facsimile: (615) 252-6311

                                                    -and-

                                                    Jennifer Olmedo-Rodriguez
                                                    Fla. Bar No.: 605158
                                                    jennifer.olmedo-rodriguez@bipc.com
                                                    Daniel R. Lazaro
                                                    Fla. Bar No.: 99021
                                                    dan.lazaro@bipc.com
                                                    Buchanan Ingersoll & Rooney PC
                                                    One Biscayne Tower
                                                    2 S Biscayne Blvd Ste 1500
                                                    Miami, FL 33131-1822
                                                    Telephone: (305) 347-4080
                                                    Facsimile: (305) 347-4089

                                                    *Attorneys for Defendant Bruce Teal*

**Error! No document variable supplied.**

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of May, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on the following counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF:

> Aleksas A. Barauskas
> Melanie Collette Kalmanson
> Akerman, LLP
> 50 North Laura Street, Suite 3100
> Jacksonville, FL 32202
> aleksas.barauskas@akerman.com
> melanie.kalmanson@akerman.com
> *Attorneys for Plaintiff*

*/s/ Jennifer Olmedo-Rodriguez*
BUCHANAN INGERSOLL & ROONEY PC

4844-6590-5384, v. 1

12

**Error! No document variable supplied.**